# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DR. AGDEL JOSE HERNANDEZ-COLON,
  *Plaintiff*,

  v.                                    No. 3:23-cv-356 (VAB)

KARL CLAVER-OBINNA and SABIH
RAHMAN,
  *Defendants.*

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Agdel Jose Hernandez-Colon ("Plaintiff" or "Dr. Hernandez-Colon") has sued Karl
Claver-Obinna ("Dr. Claver-Obinna) and Sabih Rahman ("Dr. Rahman") (collectively, the
"Defendants") alleging defamation *per se*. Compl., ECF No. 1 (Mar. 21, 2023) ("Compl.").

The Defendants have filed a motion for summary judgment. Mot. for Summ. J., ECF No.
81 (Feb. 28, 2025) ("Mot.").

For the following reasons, the Defendants' motion for summary judgment is

**GRANTED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background[1]

On October 14, 2019, Dr. Hernandez-Colon began work as director of the Psychiatry

Residency Program ("Program") for Nuvance Health Medical Practice, P.C. ("Nuvance").

---

[1] Unless noted otherwise, the following factual statements are taken from portions of the
Defendants' Statement of Material Facts that Dr. Hernandez-Colon has admitted to be true, *see*
Pl.'s SOF at 1–16, or from Dr. Hernandez-Colon's Statement of Material Facts. For facts to
which Dr. Hernandez-Colon states a proper objection, the Court will cite to Dr. Hernandez-
Colon's Statement of Material Facts, and the Defendant's Reply, if necessary to resolve whether
there are adequate grounds for Dr. Hernandez-Colon's objection, such that there remains a
disputed issue of fact.

Defendants' Rule 56(a)(1) Statement of Undisputed Material Facts, ECF No. 83 ¶ 1 (Feb. 28, 2025) ("Defs.' SMF").

In this position, Dr. Hernandez-Colon supervised the education of a class of nine first-year residents (the "PGY1 Class") and eight second-year residents (the "PGY2 Class") for the 2021- 2022 Residency Year. *Id.* ¶ 2.

Defendants Dr. Karl Claver-Obinna and Dr. Sabih Rahman, respectively, were members of the PGY1 Class and the PGY2 Class during the 2021-2022 Residency Year. *Id.* ¶ 4.

In July of 2021, just a few weeks into that program year, the PGY-I class, including Dr. Claver-Obinna, as well as Dr. Rahman, met with the Nuvance Chairman of Psychiatry and Dr. Hernandez-Colon's supervisor, Dr. Charles Herrick, to complain about being on-call, their schedules, and Dr. Hernandez-Colon. Pl.'s SOF ¶ 38. Dr. Hernandez-Colon also attended the meeting, and the Chairman and Dr. Hernandez-Colon spoke about this meeting afterwards. *Id.* During the July meeting, Dr. Rahman encouraged the PGY-I class's complaints and allegations that Dr. Hernandez-Colon was biased and unfair. *Id.* Dr. Claver-Obinna was one of the leaders of the meeting. *Id.* Dr. Claver-Obinna complained that it was unfair of Dr. Hernandez-Colon to ask the residents to work shifts during the weekend, and to schedule calls; Dr. Rahman encouraged these complaints. *Id.*

By September 30, 2021, Dr. Claver-Obinna was placed on an academic correction plan; by January 3, 2022, he was placed on academic probation; and by March 10, 2022, Nuvance issued a Notice of Non-Renewal of Contract. *Id.* ¶ 39. This was a determination reached through feedback from all of the rotations, faculty, the Designated Institutional Official, the Chairman, the Clinical Competency Committee, and Dr. Hernandez-Colon. *Id.* Dr. Claver-Obinna knew his residency would not be renewed, and he chose to appeal; he presented an appeal letter to the

Clinical Competency Committee, the Designated Institutional Official, and Dr. Hernandez-Colon during an April 1, 2022 meeting. *Id*. Dr. Claver-Obinna devoted considerable time during the April 1st meeting to complaining about Dr. Hernandez-Colon; Dr. Claver-Obinna referred to Dr. Hernandez-Colon as abusive and belligerent, and as someone who humiliated Dr. Claver-Obinna in front of hospital staff, nurses, and social workers, and, that Dr. Hernandez-Colon was responsible for Claver-Obinna's failure in the residency program. *Id*. In his letter, Dr. Claver-Obinna accused Dr. Hernandez-Colon of discrimination, and of belittling, berating, and yelling at him; Dr. Claver-Obinna devoted the vast majority of his letter of appeal to issues related to Dr. Hernandez-Colon. *Id*. Dr. Herrick attended the April 1, 2022 meeting, along with Drs. Mathew, Alpert, Cruz, Mubbashar, and possibly others. *Id.* Dr. Hernandez-Colon was also present. Defs.' SMF ¶ 12.

On March 31, 2022, in a PowerPoint presentation, Dr. Herrick, showed the various aspects of Dr. Hernandez-Colon's performance as Residency Director that they claimed to be deficient. *Id.* ¶ 3, 10.

On April 4, 2022, Nuvance's Human Resources staff convened a meeting of the residents to discuss the claims made in the PowerPoint presentation. Kathryn Duras, Director of Human Resources, and Katie Mee, Senior Human Resources Business Partner, first met with the PGY1 Class, with the exception of Dr. Claver-Obinna. *Id.* ¶ 13. Duras and Mee intentionally did not invite Claver-Obinna to the PGY1 meeting. *Id.* ¶ 14. Duras excluded him because of concerns about his performance, although Mee claimed not to be aware of Claver-Obinna's academic difficulties or non-renewal before her deposition. Pl.'s SOF ¶ 42.

During the PGY1 meeting, various members of the PGY1 Class discussed various slides in the PowerPoint. Defs.' SMF ¶ 15. Duras took notes during the PGY1 meeting. *Id.* ¶ 16. Mee

clamed not to have a specific recollection of who in the PGY2 group made the statements, and

stated that it was "everyone in the room." *Id.* ¶ 19. On April 5, 2022, Mee and Duras met with

Dr. Hernandez-Colon. *Id.* ¶ 20. Mee and Duras did not identify who had made the various claims

about Dr. Hernandez-Colon's conduct. *Id.* ¶ 21.[2]

　　　　The HR staff broke up the PGY-II residents into two groups, and each staff member met

with one group. *Id.* ¶ 45. Mee could not recall which residents were in which meeting, and that

she "did not have the names of anybody that I interviewed." *Id.* Yet, she could identify the

residents she interviewed in her PGY-II meeting, which included Dr. Rahman. *Id.* Duras could

not recall if she interviewed Dr. Rahman or whether Mee did. *Id.* ¶ 45.

　　　　Before and after the April 4, 2022, meetings, Dr. Hernandez-Colon spoke with Dr. Orna

Alpert, one of the doctors on the psychiatric team, about what happened at the meetings. *Id.* ¶ 46.

Dr. Alpert had been in one of the PGY-II meetings. *Id.* Dr. Alpert and two PGY-II residents, Dr.

Zamaar Malik and Dr. Bakht Siddiqui, said that Dr. Rahman was at their HR meeting, that he

had been "slandering" Dr. Hernandez-Colon, and accused him of being an alcoholic, a sexist, a

racist, and incompetent at his job. *Id.* After Dr. Hernandez-Colon's termination, another PGY-II

resident, Dr. Daniel Roach, reported that Dr. Rahman was not in his HR meeting, and that no one

made any allegations about Dr. Hernandez-Colon in his meeting, something consistent with

Duras's recollection. *Id.* ¶ 46.

---

[2] Mee claimed that although she had the PowerPoint presentation before the April 4th meeting,
Pl.'s SOF ¶ 43, she first saw it when members of the PGY-I class showed it during the April 4th
meeting. *Id.* She had no recollection of who "presented" the PowerPoint. *Id.* Similarly, Duras
could not say who was responsible for the alleged quotations attributed to Dr. Hernandez-Colon
in the PowerPoint, even though she heard the presentation. *Id.* Dr. Claver-Obinna also could not
recall how he learned about the PowerPoint, but denied having created it. *Id.* ¶ 44. Dr. Rahman,
who had the PowerPoint presentation, could not recall how he got it, and did not have the "owner
password" seemingly required to save it. *Id.*

On April 5, 2022, the HR representatives met with Dr. Hernandez-Colon; they repeated all of the accusations that they heard on April 4, 2022, through the PGY-I meeting, the PowerPoint presentation, and one of the PGY-II meetings. *Id.* ¶ 47. Dr. Hernandez-Colon denied all of the allegations. *Id.*

On April 6, 2022, Mee and Duras met with Dr. Jerry Mathew, the Assistant Director of the Program. Defs.' SMF ¶ 23. After completing the interviews, Duras met with Dr. Herrick and Dr. Christopher Lehrach, Nuvance's Chief Physician Executive. *Id.* ¶ 3, 25. Based on the information gathered by Mee and Duras, Duras recommended that Dr. Hernandez-Colon be terminated, and Dr. Herrick and Dr. Lehrach agreed. *Id.* ¶ 26.

On April 7, 2022, Nuvance sent a termination letter. *Id.* ¶ 27. The termination letter alleged breaches of Dr. Hernandez-Colon's Employment Agreement: "These breaches include violations of the Nuvance Equal Employment Opportunity EEO and Non Discrimination Policy, the Rules of Conduct Policy, and the Sexual and Unlawful Harassment Policy. For instance, the investigation confirmed you threatened to assign call as punishment and in retaliation for resident's voicing of concerns, including to [Accreditation Council for Graduate Medical Education ("ACGME")], coached Residents on what to say and not to say during an ACGME site visit which does not align with NHMP's policies, nor that of ACGME, and threated to fail Residents or not pay Residents – again, all contrary to NHMP policies and ACGME standards. You were also found to have engaged in highly inappropriate racial and gender based comments." *Id.*

The grounds for Dr. Hernandez-Colon's termination were documented instances in the PowerPoint and statements in interviews, including the interview of the PGY1 Class, other than Dr. Claver-Obinna, the interview of Dr. Mathew, and the interview of Plaintiff himself. *Id.* ¶ 28.

### B. Procedural History

On March 21, 2024, Dr. Hernandez-Colon filed his Complaint. Compl.

On July 13, 2023, Dr. Hernandez-Colon filed a motion for default entry against Dr. Claver-Obinna. Motion for Default Entry, ECF No. 16.

On July 14, 2023, the Court granted Dr. Hernandez-Colon's motion for default entry. Order, ECF No. 17.

On July 20, 2023, Dr. Hernandez-Colon and Dr. Claver-Obinna filed a stipulation to vacate the default against him. Stipulation, ECF No. 22.

On July 21, 2023, the Court vacated the entry of default against Dr. Claver-Obinna. Order, ECF No. 24.

On August 11, 2023, the Defendants filed their Answers to the Complaint. *See* Answer, ECF No. 26 (Dr. Claver-Obinna's Answer); Answer, ECF No. 27 (Dr. Rahman's Answer).

On February 28, 2025, the Defendants filed a motion for summary judgment, Mot., their memorandum in support of their motion for summary judgment, Mem. in Support of Mot. for Summ. J., ECF No. 82 ("Mem."), their Rule 56(a)(1) Statement of Undisputed Material Facts, Defs.' SMF, and their related exhibits, Defs.' Mot. for Summ. J. Exhibits, ECF No. 84.

On April 11, 2025, Dr. Hernandez-Colon filed his objection to the Defendants' motion for summary judgment, Obj. to Defs.' Mot. for Summ. J., ECF No. 91 ("Obj."), and his memorandum in opposition to the Defendants' motion for summary judgment, Mem. in Opp'n to Defs. Mot. for Summ. J., ECF No. 92 ("Opp'n").

On April 12, 2025, Dr. Hernandez-Colon filed his Rule 56(a)(2) Statement of Facts, ECF No. 93 ("Pl.'s SOF"), and his related exhibits, Exhibit re Objection, ECF No. 94.

6

On April 25, 2025, the Defendants filed a reply in support of their motion for summary judgment, Reply, ECF No. 95, and a corrected reply, Reply, ECF No. 96 ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some

unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

The Defendants argue that summary judgment should be granted against Dr. Hernandez-Colon's defamation *per se* claim because he has not shown a genuine issue of material fact as to this claim because: (1) "he has not adduced any admissible evidence that either Defendant made any statements about [him,]" Mem. at 14; and (2) "[he] cannot prove any damages he sustained due to any statements [the] Defendants may have made." *Id.* at 26.

The Defendants also assert various defenses to Dr. Hernandez-Colon's defamation claim including that: (1) "the statements [he] attributes to [the] Defendants would be statements of opinion[,]" *id.* at 20; (2) "many of the alleged statements were demonstrably true," *id.* at 22; and (3) "he . . . cannot overcome the qualified privilege for intracorporate communications in the context of employment decisions." *Id.* at 24.

The Court will address the defamation *per se* claim first and then turn to any defenses to that claim.

### A.  The Defamation *Per Se* Claim

"Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (citing *Mercer v. Cosley*, 955 A.2d 550, 561 (Conn. App. 2008)). "A defamatory statement is defined as a communication that tends to 'harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her.]'" *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763 (Conn. 2004).

 "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 969 A.2d 736, 742 (Conn. 2009) (citation omitted).

The Court will consider the elements of a prima facie case of defamation in turn.

1.  Publication of a Defamatory Statement[3]

"[A] defamatory statement is defined as 'a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (quoting *Gambardella*, 969 A.2d at 742).

"'Publication, is a word of art, which includes any communication by the defendant to a third person.'" *Johns v. Brown*, No. CV085024593, 2009 WL 1218623, at *4 (Conn. Super. Ct. Apr. 8, 2009) (cleaned up) (quoting *Pickering v. St. Mary's Hospital,* Superior Court, judicial district of Waterbury, Docket No. CV 05-4002947 (June 29, 2005, Eveleigh, J.) (quoting 3 Restatement (Second), Torts § 652D, comment (a) (1971))). *See also Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co. of Illinois*, 724 A.2d 1117, 1122 (1999) ("The term 'publication,' however, generally refers to the communication of words to a third person.").

The Defendants argue that Dr. Hernandez-Colon cannot prove that the allegedly defamatory statements were published by the Defendants because Dr. Hernandez-Colon "has not

---

[3] The first and third elements of a prima facie case of defamation—that the defendant published a defamatory statement, and that the defamatory statement was published to a third person, respectfully—are discussed in this section, while the fourth element—that the plaintiff's reputation suffered injury as a result of the statement—is discussed in the next section. Because neither party raises an argument about the second element—that the defamatory statement identified the plaintiff to a third person—the Court does not consider that element. *See Hulinsky v. Cnty. of Westchester*, No. 22-CV-06950 (PMH), 2025 WL 835646, at *4 (S.D.N.Y. Mar. 14, 2025) ("It is equally clear that the Court may not generally adjudicate issues at the summary judgment phase which were not raised in the movant's motion.") (citing *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 96 (2d Cir. 2016) ("The District Court reasoned that it 'scoured the record to determine if there is a triable issue as to this defense' and determined that there was no triable issue. This decision was in error. The Federal Rules state that a court may grant summary judgment sua sponte only '[a]fter giving notice and a reasonable time to respond' and 'after identifying for the parties material facts that may not be genuinely in dispute.'") (internal citations omitted) (quoting Fed. R. Civ. P. 56(f))), *reconsideration denied in part*, No. 22-CV-06950 (PMH), 2025 WL 1225169 (S.D.N.Y. Apr. 28, 2025)).

adduced any admissible evidence that either Defendant made any statements about [the] Plaintiff," Mem. at 14; and the Defendants also argue that "[f]or a statement made in the workplace to qualify as being published, it must 'have been communicated among the employee's supervisors and have been included in the employee's personnel file.'" *Id.* at 14 n. 2 (quoting *Gambardella*, 969 A.2d at 740). The Defendants claim that Dr. Hernandez-Colon's proof of publication is inadmissible because, "the statements supposedly relayed by Claver-Obinna's therapist do not establish Claver-Obinna made any communications to Nuvance human resources, and the statements supposedly relayed by the two other PGY2s could not have been made by Rahman because those two were not in the same group as Rahman." Mem. at 14.

In opposition, Dr. Hernandez-Colon argues that: (1) "[a]ccording to the accounts relayed to the plaintiff, PGY-II residents Malik and Siddiqui both witnessed Rahman making the defamatory statements during their meeting[.] . . . However, even if those accounts are inaccurate, and Malik and Siddiqui were in fact in the Duras meeting, and Rahman was not, then Rahman was in the Mee meeting. As Mee could not recollect who was in her meeting, or who relayed which complaints contained in her notes, all of the allegations contained in her notes may be properly attributable to Rahman," Opp'n at 12 (citation omitted); and (2) that "[t]he PowerPoint presentation, which seems to have appeared out of nowhere, is likewise attributable to both defendants[,]" because "[m]any of the allegations in the PowerPoint correlate with Rahman's statements during the HR meeting," "Rahman could not explain how he could access the PowerPoint presentation saved on his phone without the 'owner password[,]'" and "[b]oth [Dr. Claver-Obinna's] appeal letter and the PowerPoint begin with attestations of love for the residency program; both accuse the plaintiff of belittling the author and his feedback; both

accuse the plaintiff of berating the author; both suggest the plaintiff is guilty of some vague discrimination." Opp'n at 12–13.

In reply, the Defendants argue again that all of Dr. Hernandez-Colon's complained of statements are hearsay without an exception because "[t]he purported statements by Drs. Bednarski and Alpert were made out of court to Plaintiff, and are offered to prove the matters asserted. Specifically, [the] Plaintiff offers Dr. Bednarski's hearsay statement as proof Claver-Obinna threatened to report [the] Plaintiff to HR, and Dr. Alpert's double hearsay statement communicating what Siddiqui and Malik purportedly told her as proof of what Rahman said during the PGY2 meeting." Reply at 3.

The Court agrees, in part.

"[Federal] Rule [of Civil Procedure] 56(e) provides that affidavits in support of and against summary judgment shall set forth such facts as would be admissible in evidence. Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

"[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (citations omitted). And "[t]he testimony of witnesses as to what someone else told them a party said is inadmissible double hearsay." *Gilligan v. Town of Moreau*, 234 F.3d 1261, *5 n.4 (2d Cir. 2000) (summary order) (unpublished table decision); *see Agric. Ins. Co. v. Ace Hardware Corp.*, 214 F. Supp. 2d 413, 416 (S.D.N.Y. 2002) ("If the party admission, however, merely repeats hearsay and thus fails to concede its underlying trustworthiness, it is inadmissible.").

Here, in support of his defamation *per se* claim, however, Dr. Hernandez-Colon relies only on inadmissible hearsay. As to whether Dr. Rahman "accused the plaintiff of being an alcoholic, a sexist, a racist, and incompetent in his job," Dr. Hernandez-Colon relies not on witness testimony from someone who heard Dr. Rahman make the alleged statements, but on the testimony of someone who allegedly heard what Dr. Rahman had said from another source. *See* Hernandez-Colon Depo. at 142:6–17 ("Q. What, if you know, did Dr. Siddiqui say to Dr. Alpert after the meeting about what transpired? A. Well, that transpire there was a meeting among four people, Siddiqui, Malik, another resident, and Rahman was there. They describe Rahman as being manicy, slandering me, me being an alcoholic, me being a sexist, me being a racist, me being incompetent. Q. And you never heard that directly from Dr. Siddiqui, correct? A. Why did I need to hear from him? Q. Dr. Alpert told you that? A. Yeah."); *id.* at 144:9–20 ("Q. And so what's the source of your information for Malik's account of what transpired in the April 4 meeting? A. Well, they were together. There were Malik and Siddiqui. They -- Q. No. The source of your information. How do you know what Malik maintains happened in the meeting if you've never spoken to Malik? A. Well, he report to Dr. Alpert the same as Siddiqui did. They were there in the meeting. Q. You know this from Dr. Alpert? A. Yes.").

Dr. Hernandez-Colon thus relies on what Dr. Alpert allegedly heard from two PGY-II residents, Drs. Zamaar Malik and Bakht Siddiqui, about what Dr. Rahman allegedly said, rather than the direct statements from these two residents of what they heard Dr. Rahman say, which could be a party admission and not hearsay. *See* FRE 801(d)(2) (excluding from the definition of hearsay a "statement . . . offered against an opposing party and (A) was made by the party . . . ."). In the absence of providing admissible testimony from someone who actually heard what Dr. Rahman said and can testify to the exact content of his statements, Dr. Hernandez-Colon lacks

admissible evidence to support his claim and thus cannot create a genuine issue of fact for resolution at a trial.[4]

As to whether Dr. Claver-Obinna "stated that the plaintiff was abusive and belligerent, that he diminished and humiliated Claver-Obinna in front of hospital staff, nurses, and social workers, and, that the plaintiff was responsible for Claver-Obinna's failure in the residency program[,]" Dr. Hernandez-Colon relies on statements that Dr. Claver-Obinna made during his residency appeal meeting, a meeting Dr. Hernandez-Colon attended. *See* Pl.'s SOF at 19 (citing Hernandez-Colon Depo. at 119:6–21); Hernandez-Colon Depo. at 119:6–25 ("Q. And so we can read Exhibit 6 for ourselves. It speaks for itself. My question is in the April 1 meeting in which Karl is there appealing his decision to CCC in which you're present, did Karl raise anything that's not set forth in this document specific to concerns about you? A. Yes. Q. What? A. Well, I mean, I'm not completely sure if he knew that I was in that meeting, because I was muted kind of in the back. I wasn't even able to talk, because I know I should not be talking there. So besides what he wrote there, I mean, he was all about me at that meeting. Q. What did he say about you at that meeting? A. That I was abusive, that I was kind of -- a word that he used was belligerent, kind of

---

[4] Dr. Hernandez-Colon also argues these allegedly defamatory statements are similar to statements contained within Mee's notes and the PowerPoint presentation. *See* Opp'n at 12 ("As Mee could not recollect who was in her meeting, or who relayed which complaints contained in her notes, all of the allegations contained in her notes may be properly attributable to Rahman. Allegations of unprofessionalism, bullying, racism, and sexism."); *id.* ("The PowerPoint presentation, which seems to have appeared out of nowhere, is likewise attributable to both defendants. Many of the allegations in the PowerPoint correlate with Rahman's statements during the HR meeting. Rahman could not explain how he could access the PowerPoint presentation saved on his phone without the 'owner password.'") (internal citations omitted). But Mee's notes and the PowerPoint presentation are also hearsay, unless admissible under a proper exclusion or exception. And, without some admissible evidence of direct attribution of these statements to Dr. Rahman, these statements are neither corroborative enough nor these circumstances exceptional enough to consider them otherwise admissible to support a defamation *per se* claim against him. *See United States v. Guo*, No. 23 CR. 118 (AT), 2024 WL 1939221, at *5 (S.D.N.Y. May 2, 2024) ("The residual hearsay exception provides that hearsay is admissible even if the statement is not admissible under a hearsay exception when '(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.'" Fed. R. Evid. 807(a)."); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) ("Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.") (quoting *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979)).

diminishing, humiliating him, that I was kind of the guilty one or kind of responsible for him not

to be renewed."). These statements would be admissible as statements of a party-opponent. *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 82 (2d Cir. 2010) ("Federal Rule of Evidence 801(d)(2)

specifically provides that a statement is not hearsay if it is offered against a party and is [] "(A)

the party's own statement, in either an individual or a representative capacity . . .").

     And, as to whether Dr. "Claver-Obinna accuse[d] the plaintiff of discrimination, and of

belittling, berating, and yelling at him," Dr. Hernandez-Colon relies on an alleged letter from

Dr.Claver-Obinna. Pl.'s SOF at 19 (Exhibit H to Mot., Dr. Claver-Obinna Letter, ECF No. 84-10

at 2 ("My name is Karl Claver-Obinna . . . I have been yelled at, belittled, berated by my

program director in front of staff, patients and other residents. . . . I was pushed to staying silent

in many of these scenarios because in an effort to explain things I have been consistently told "I

don't take criticism well" or that I have "attitude". I am not saying this is discrimination, and I

really do not think it is as I reflected on it, but how else am I supposed to view it.").

     "[R]esolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of

the party against whom summary judgment is sought[,]" *Dufort*, 874 F.3d at 347, this letter could

be attributable to Dr. Claver-Obinna, and would also be admissible as a statement of a party-

opponent. *See Spiegel*, 604 F.3d 72, 82 (2d Cir. 2010) ("Federal Rule of Evidence 801(d)(2)

specifically provides that a statement is not hearsay if it is offered against a party and is [] "(A)

the party's own statement, in either an individual or a representative capacity . . .").

     Thus, because Dr. Hernandez-Colon has admissible evidence that Dr. Claver-Obinna

made communications to third parties tending to harm the reputation of Dr. Hernandez-Colon,

Dr. Hernandez-Colon has raised a sufficient genuine issue of material fact as to the publication

of statements by Dr. Claver-Obinna. *See Lawrence v. Altice USA*, No. 3:18-CV-1927 (SRU),

2020 WL 108980, at *6 (D. Conn. Jan. 9, 2020) ("A defamatory statement is a communication that harms another's reputation.") (citing *Gleason v. Smolinski*, 125 A.3d 920, 947 (Conn. 2015)), *aff'd*, 841 F. App'x 273 (2d Cir. 2021); *see, e.g.*, *Rosenberg v. Meriden Hous. Auth.*, No. CV 950377376, 1999 WL 1034611, at *15 (Conn. Super. Ct. Oct. 29, 1999) ("Because the defendants have not met their burden of showing that there are no genuine issues of material facts regarding these statements, the defendants are not entitled to summary judgment of the plaintiffs' cause of action for defamation as to these statements."). [5]

Accordingly, summary judgment will be granted as to Dr. Hernandez-Colon's defamation *per se* claim against Dr. Rahman,[6] but as to Dr. Claver-Obinna, it will be denied, at least on the grounds of publication.

### 2. Damages and Injury to Reputation

Ordinarily, "[t]o prevail on a common-law defamation claim, a plaintiff must prove that the defendant published false statements about her that caused pecuniary harm." *Daley v. Aetna Life & Cas. Co.*, 734 A.2d 112, 129 (Conn. 1999). But, "when a plaintiff claims defamation per se, she need not prove damages." *Gambardella*, 863 A.2d at 741 (internal citation omitted). "When the defamatory words are actionable per se, the law conclusively presumes the existence

---

[5] The Defendants have an additional argument regarding publication that "[f]or a statement made in the workplace to qualify as being published, it must 'have been communicated among the employee's supervisors and have been included in the employee's personnel file.'" *Id.* at 14 n. 2 (quoting *Gambardella v. Apple Health Care, Inc.*, 863 A.2d 735, 740 (Conn. App. 2005)). Given the application of the intracorporate communications privilege below, *see infra* at 25–28, however, and because Dr. Hernandez-Colon has raised a sufficient genuine issue of material fact as to the publication of Dr. Claver-Obinna's statements, the Court need not address this argument further.

[6] Even though Dr. Hernandez-Colon fails to make out a prima facie case of defamation *per se* against Dr. Rahman, and any such claim can and should be dismissed against Dr. Rahman on these grounds alone, as discussed further below, the claim against him – as well as Dr. Claver-Obinna – fail for other reasons.

of injury to the plaintiff's reputation. The plaintiff is required neither to plead nor to prove it. Whether a publication is libelous per se is a question for the court." *Id.* (cleaned up) (quoting *Lowe v. Shelton*, 851 A.2d 1183, 1195 (Conn. App. 2004), *cert. denied*, 859 A.2d 568 (Conn. 2004).

"Libel is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business. Libel is also actionable per se if it charges a crime involving moral turpitude or to which an infamous penalty is attached." *Lowe*, 851 A.2d at 1195 (quoting *Miles v. Perry*, 529 A.2d 199, 209 (Conn. App. 1987)).

The Defendants argue that they "are still entitled to judgment as a matter of law because [their statements] do not constitute defamation *per se* and Plaintiff cannot prove special damages." Mem. at 27. They argue that "none of these statements charge improper conduct or lack of skill or integrity in Plaintiff's profession—the medical field[,]" *id.* at 28, and that "Plaintiff cannot prove any damages resulted from statements made by Defendants because the record is clear that Plaintiff's termination was based on statements made in the PowerPoint presentation, made by other members of the PGY1 Class, and made by Plaintiff himself." *Id.*

In opposition, Dr. Hernandez-Colon argues that the Defendants allegedly defamatory statements were calculated to cause injury to his profession and business, and that he "was fired as a direct result of the defamatory statements made by, and/or fairly attributable to, the defendants." Opp'n at 17.

The Court agrees.

When determining whether calling someone a "white supremacist" on Facebook was defamation *per se*, the Connecticut Supreme Court recently stated that while it was not

actionable in that instance, "[i]f the term was connected to the plaintiff's professional occupation or to specifically alleged activities, it might have been actionable under Connecticut defamation law." *Murphy v. Rosen*, 329 A.3d 913, 926 (Conn. 2025) (citing *Benvenuto* v. *Brookman*, 309 A.3d 292, 295 and n.3 (Conn. 2024) (referencing trial court's determination that statements about plaintiff being racist in context of his professional capacity as police officer were defamatory per se); *see also Cody v. Dirir*, No. TTD-CV-20-6020396-S, 2024 WL 185375, at *5 (Conn. Super. Ct. Jan. 12, 2024) ("Statements that only comment on a party's personality, rather than their job performance, do not constitute libel per se.").

Dr. Hernandez-Colon mainly complains of statements regarding conduct in his professional capacity, which were made to supervisors and human resources, and resulted in his termination. *See* Pl.'s SOF at 19 (alleging that in a meeting about appealing his non-renewal of his residency, Dr. Claver-Obinna "stated that the plaintiff was abusive and belligerent, that he diminished and humiliated Claver-Obinna in front of hospital staff, nurses, and social workers, and, that the plaintiff was responsible for Claver-Obinna's failure in the residency program."); *id.* (alleging that in a letter appealing his non-renewal of his residency, Dr. Claver-Obinna "accuse[d] the plaintiff of discrimination, and of belittling, berating, and yelling at him[.]"); *id.* at 22 (alleging that in a human resources meeting, Dr. Rahman "accused the plaintiff of being an alcoholic, a sexist, a racist, and incompetent in his job."); Opp'n at 23 ("The April 7, 2022, termination letter addressed to the plaintiff repeats the same allegations made in the PowerPoint and the residents' HR meetings.") (citing Dr. Hernandez-Colon's Termination Letter, ECF No. 84-9 at 2–3 (Feb. 28, 2025) ("This suspension resulted from credible allegations that you engaged in egregious conduct towards Psychiatry Residents that included, in part, using call as a punishment, making insensitive and highly inappropriate comments about African Americans,

females and nurse practitioners. . . . For instance, the investigation confirmed you threatened to
assign call as punishment and in retaliation for resident's voicing of concerns, including to
ACGME, coached Residents on what to say and not to say during an ACGME site visit which
does not align with NHMP's policies, nor that of ACGME, and threated to fail Residents or not
pay Residents – again, all contrary to NHMP policies and ACGME standards. You were also
found to have engaged in highly inappropriate racial and gender based comments. . . . We regret
that your misconduct compels us to take this action.")).

As a result, because these statements relate to Dr. Hernandez-Colon's professional
behavior, and led to his termination, these statements constitute defamation *per se*, and Dr.
Hernandez-Colon does not need to prove damages. *See Gaudio v. Griffin Health Servs. Corp.*,
733 A.2d 197, 215 (Conn. 1999) ("In the context of per se defamatory statements such as those
contained in the plaintiff's letter of termination, 'the law conclusively presumes the existence of
injury to the plaintiff's reputation. He is required neither to plead nor to prove it.'") (quoting
*Torosyan*, 662 A.2d 89 at 106 (quoting *Urban v. Hartford Gas Co.*, 93 A.2d 292, 295 (Conn.
1952))).

Accordingly, summary judgment is not granted on the grounds of damages.

### B.  The Defenses to the Defamation *Per Se* Claim

In addition to challenging Dr. Hernandez-Colon's ability to raise a genuine issue of
material fact in regard to the prima facie case of defamation, the Defendants also raise the
defenses of opinion, truth, and privilege in their motion for summary judgment. *See* Mem. at 20
("[T]he statements [Dr. Hernandez-Colon] attributes to [the] Defendants would be statements of
opinion[.]"); *id*. at 22 ("[M]any of the alleged statements were demonstrably true[.]"); *id.* at 24

("[Dr. Hernandez-Colon] . . . cannot overcome the qualified privilege for intracorporate communications in the context of employment decisions.").

The Court will address each defense in turn.

### 1. The Opinion Defense

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . . But it is not enough that the statement inflicts reputational harm. To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 47 (Conn. 2020) (citations and internal quotation marks omitted). "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known . . . . An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact." *Goodrich v. Waterbury Republican–Am., Inc.*, 448 A.2d 1317, 1321 (Conn. 1982) (citations omitted).

In deciding whether an allegedly defamatory statement is opinion or fact, there are three factors to consider: "(1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification." *NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 50 (Conn. 2020).

"The important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's

opinion, or as a statement of existing fact." *Goodrich*, 448 A.2d at 1321–22 (internal quotation

marks omitted) (citing 1 Harper & James, op. cit., § 5.28, p. 458, and *Mashburn v. Collin*, 355

So.2d 879, 885 (La.1977)).

The Defendants argue that "the statements Plaintiff attributes to Defendants would be

statements of opinion," Mem. at 20, because "Dr. Claver-Obinna's Appeal Letter, and his

statements about it during the Appeal Meeting, consisted of his own opinion about how he was

treated by Plaintiff," *id.*, and "the generalized statements contained in Mee's notes, even if

attributable to Rahman specifically, would constitute opinion as well." *Id.* at 21.

In response, Dr. Hernandez-Colon argues that the alleged statements were "presented as

facts, made with the purpose of achieving the professional discipline or termination of the

plaintiff. [And] [t]he allegations were certainly capable of objective verification[.]" Opp'n at 14–

15.

In reply, the Defendants argue that Dr. Hernandez-Colon has not "demonstrate[d] these

broad statements are, in fact, factual." Reply at 10.

The Court agrees, in part.

The analysis begin[s] with the critical determination of whether, as a matter of law, the

allegedly libelous assertions can reasonably be characterized as either a fact or an opinion . . . ."

*Goodrich*, 448 A.2d at 1321 (citations omitted). Dr. Hernandez-Colon alleges that Dr. Rahman

"accused the plaintiff of being an alcoholic, a sexist, a racist, and incompetent in his job." Pl.'s

SOF at 22. He further alleges that Dr. Claver-Obinna "stated that the plaintiff was abusive and

belligerent, that he diminished and humiliated Claver-Obinna in front of hospital staff, nurses,

and social workers, and, that the plaintiff was responsible for Claver-Obinna's failure in the

residency program[,]" *id.* at 19, and that "Claver-Obinna accuse[d] the plaintiff of

discrimination, and of belittling, berating, and yelling at him[.]" *Id.* But, other than his allegation with respect to "yelling," all of these allegedly defamatory statements are non-actionable opinions.

Dr. Rahman's alleged comments accusing Dr. Hernandez-Colon of being an "alcoholic", a "sexist", and a "racist," "without more," are non-actionable opinion. *See, e.g., Murphy*, 329 A.3d at 923 ("We agree that characterizing someone as a 'white supremacist,' without more, is a matter of personal opinion rather than a fact that can be verified by this court."). Similarly, Dr. Claver-Obinna's alleged statements about Dr. Hernandez-Colon being "incompetent," how he was "belittling," "berating," "abusive," and "belligerent," how he "diminished" and "humiliated" them, how he committed "discrimination," and was "responsible for Dr. Claver Obinna's failure in the residency program," also constitute non-actionable opinion, because they are statements indicating thoughts about alleged behavior rather than mentioning verifiable facts that "relate[] to an event or state of affairs that existed in the past or present and [are] capable of being known," *Goodrich*, 448 A.2d at 1321.

But, whether someone yelled, or "utter[ed] a loud cry, scream, or shout," *Yell*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/yell, is a statement relating to something more akin to a provable fact, or "an event or state of affairs that existed in the past or present and is capable of being known," *Goodrich*, 448 A.2d at 1321, and could be an actionable statement of alleged defamation.

Accordingly, summary judgment will be granted as to Dr. Hernandez-Colon's defamation *per se* claim as to every statement, except the alleged statement that Dr. Hernandez-Colon "yelled" at Dr. Claver-Obinna.

2.  The Truth Defense

In any event, even for the statements appropriately characterized as nonactionable opinion as a matter of law, defamation requires a showing of falsity, as the communication of true statements does not constitute defamation. *See Simms v. Seaman*, 69 A.3d 880, 890 (Conn. 2013) ("... the communication of a falsehood is an essential element of both defamation and fraud...."). "[T]ruth is an affirmative defense to defamation." *Cweklinsky*, 837 A.2d at 770.

The Defendants argue that the alleged defamatory statements were true because there is evidence that Dr. Hernandez-Colon said the "residents' notes sucked and were horrible," Mem. at 23; "threaten[ed] additional on call time as a punishment," *id.*; responded "yes" to raising his voice at residents, *id.*; "in his own interview with Human Resources admitted to making remarks about black people in the Bronx or NYC as part of his pathology discussions[,]" *id.* at 24; and acknowledged that he "do[es]n't like Nurse Pract[ioners]" *Id.*

Dr. Hernandez-Colon mostly does not respond to these arguments, except to say that "it was not the plaintiff's job responsibility to schedule call[,]. . . [so] it defies logic for the defendants to argue 'truth' as defense to this defamatory statement." Opp'n at 13.

In reply, the Defendants argue that Dr. Hernandez-Colon admitted in an interview that he uses call as punishment when he said "[t]here has to be a way to enforce when they don't do it …this is the only way is to assign them more calls." Reply at 11 (quoting ECF No. 84-8 at 2 (Feb. 28, 2025)).

The Court agrees, in part.

"The defense of truth is available only for statements of fact, as opposed to statements of pure opinion or statements of mixed fact and opinion." *Lelyo v. Dickinson*, No. CV136010933S, 2015 WL 1867248, at *4 (Conn. Super. Ct. Mar. 26, 2015) (citing among others *Goodrich*, 448

A.2d at 1321 n.4 ("As a general rule, the defense of truth applies to statements of fact[.]").

Because the Court has already found the majority of the complained of statements to be

statements of non-actionable opinion, the defense of truth is not available for those statements

and therefore the Court declines to determine the truth of those statements. *See supra* at 20–22;

*see, e.g.*, *Stevens v. Helming*, No. CV116019393S, 2014 WL 3805495, at *18 (Conn. Super. Ct.

June 23, 2014), *aff'd*, 135 A.3d 728 (Conn. App. 2016) ("In the present case, because the court

accepts that 'probably 99 percent would stand up' is a statement of opinion, it need not consider

whether this statement is true.") (citing *Goodrich*, 448 A.2d at 1321 n.4).

Here, the only actionable statement is that Dr. Hernandez-Colon yelled at Dr. Claver-

Obinna. *See supra* at 22. As to this statement, Defendants cite to an interview with Dr.

Hernandez-Colon where when asked "Have you ever raised your voice to the residents[,]" Dr.

Hernandez-Colon responded, "Yes, I have scolded residents when they repeat the same mistakes

over and over[,]" *see* Mem. at 23 (citing Exhibit F to Mot., ECF No. 84-8 at 5), and Dr.

Hernandez-Colon did not raise an argument opposing the Plaintiffs' defense of truth regarding

the alleged defamatory statement that Dr. Hernandez-Colon yelled at Dr. Claver Obinna. As a

result, the defense of truth does apply to this statement. *See, e.g.*, *Savage v. Andoh*, No.

NNHCV075015657S, 2013 WL 951173, at *14 (Conn. Super. Ct. Feb. 6, 2013) ("Overall, the

plaintiff, having the burden of showing that the defendant's statements of fact are untrue, has not

demonstrated the falsity of the defendant's allegedly libelous statements of fact. Therefore,

because truth is an absolute defense to an allegation of libel, the defendant cannot be held liable

for statements that are substantially true, as shown by the proffered evidence."); *Cleaveland v.*

*Home Depot USA Inc.*, No. 3:23-CV-1298 (SVN), 2025 WL 1640246, at *8 (D. Conn. June 10,

2025) ("It is well-established that a plaintiff effectively concedes a defendant's arguments by his

failure to respond to them.") (quoting *Nance v. N.Y. Pub. Interest Rsch. Grp. Fund, Inc.*, No. 1:23-cv-3030 (MKV), 2025 WL 965883, at *6 (S.D.N.Y. Mar. 31, 2025) (citing cases)).

Accordingly, summary judgment is granted as to the alleged statement that Dr. Hernandez-Colon "yelled" at Dr. Claver-Obinna.

### 3.   The Qualified Privilege Defense

Even if Dr. Hernandez-Colon still had a viable defamation *per se* claim against either Dr. Rahmann, or Dr. Claver-Obinna—which, for the reasons stated above, he no longer does—"[a] defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. The first is whether the privilege applies, which is a question of law over which our review is plenary. The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact." *Gambardella*, 969 A.2d at 742–43 (citations omitted).

"[A] qualified privilege is lost upon a showing of either actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, or malice in fact, i.e., publication of a false statement with bad faith or improper motive." *Id.* at 744 (citations omitted).

The Defendants argue that all of Dr. Hernandez-Colon's allegations against the Defendants' "intracorporate communications [are] subject to the qualified privilege. Thus, Plaintiff must prove actual malice, which he cannot do." Mem. at 26.

In opposition, Dr. Hernandez-Colon argues that "such a privilege is limited, and it does not apply to statements by subordinates, such as the defendants here." Opp'n at 15. Dr. Hernandez-Colon further argues that even if the privilege does apply, the "Defendants made

these claims and false reports with actual malice, in that the statements were made as a result of Defendants' disapproval of Plaintiff's sexuality in an attempt to discredit and ultimately remove him from his managing position at Putnam Hospital. [And] [a]lternatively, Defendants' statements were published with reckless disregard for the truth or falsity of same and were made solely to injure Plaintiff." *Id.* at 17 (quoting Compl. at 13).

The Court disagrees.

"Connecticut affords a qualified privilege to intracorporate communications." *Malik v. Carrier Corp.*, 202 F.3d 97, 108 (2d Cir. 2000) (citing *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 662 A.2d 89, 103 (Conn. 1995)). "[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." *Torosyan*, 662 A.2d at 103.

The alleged defamatory statements that Dr. Hernandez-Colon complains of occurred during meetings with management related to Dr. Claver-Obinna's non-renewal of residency or other meetings with human resources officials where Dr. Hernandez Colon's alleged misconduct came up. *See* Pl.'s SOF at 19 ("Claver-Obinna devoted considerable time during the April 1st [appeal of non-renewal of residency] meeting to complaining about the plaintiff . . ."); *id.* at 22 ("Rahman was in their HR meeting, that he was 'slandering' the plaintiff . . .").

Courts in this District, the Second Circuit, and a Connecticut court have all applied the privilege to communications between and from employees of an organization for purposes of investigations of potential employee misconduct, and thus, the intracorporate communications privilege applies to all of the allegedly defamatory statements complained of by Dr. Hernandez-

Colon. *See Alvarado v. PMB, LLC*, No. FST CV 22-6058415-S, 2024 WL 3271910, at *7 (Conn. Super. Ct. June 28, 2024) (finding that "the qualified privilege [of intracorporate communications] does apply where a co-worker made complaints to their employer about another employee's alleged misconduct); *Bailey v. Nexstar Broad., Inc.*, No. 3:19-CV-00671(VLB), 2020 WL 1083682, at *6–7 (D. Conn. Mar. 6, 2020) (finding that statements made by co-workers to management during the course of an internal investigation were "subject to the intracorporate communications privilege"); *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 154 (2d Cir. 2002) (affirming summary dismissal of defamation claim because co-workers' statements were "protected by qualified privilege for statements made, without any showing of bad faith or malice, in response to employer's investigation into a theft by a fellow employee"); *Egbujo v. Jackson Lewis P.C.*, No. 22-2854-CV, 2023 WL 8295317, at *4 (2d Cir. Dec. 1, 2023) (finding that "a qualified privilege applies under Connecticut law to communications made" in response to an employer's request for an investigation regarding an employee's potential misconduct).

While "a qualified privilege is lost upon a showing of either actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, or malice in fact, i.e., publication of a false statement with bad faith or improper motive," *Gambardella*, 969 A.2d at 744, there is no genuine issue of material fact here as to malice because the alleged statements are either non-actionable opinions that cannot be proven true or false, or statements protected by the defense of truth, and a showing of malice requires the publication of a false statement. *See, e.g.*, *Malik v. Carrier Corp.*, 202 F.3d 97, 109 (2d Cir. 2000) (finding that regarding a defamation claim where an intracorporate communication privilege was claimed, "[t]he district court granted judgment as a matter of law on this

27

[defamation] claim because it found that '[t]here has been no proof at all that Ms. Kramer had any question in her mind about the truth of what she was saying, even though she may not have expressed it fully, nor is there any indication that she harbored malice about the plaintiff.' We agree.").

Accordingly, even if Dr. Hernandez-Colon's defamation *per se* claim survived for other reasons, summary judgment would be granted on qualified privilege grounds as to all of his claims.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED**.

The Clerk of Court is instructed to enter judgment for the Defendants, Dr. Karl Claver-Obinna, and Dr. Sabih Rahman, and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 22nd day of August, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE